IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 26, 2020 Session

**STATE OF TENNESSEE v. ELI KEA**

**Appeal from the Criminal Court for Knox County**
**No. 111000      G. Scott Green, Judge**

_____

**No. E2019-00890-CCA-R3-CD**

_____

The Defendant, Eli Kea, was convicted by a jury of four counts of attempted aggravated robbery, four counts of aggravated assault, one count of reckless aggravated assault, and two counts of reckless endangerment of another by discharging a firearm into an occupied habitation. Thereafter, the trial court merged several of the convictions and imposed an effective ten-year sentence. On appeal, the Defendant contends that (1) the trial court erred in denying his motion to suppress, arguing that the officers lacked reasonable suspicion for an investigatory stop of his vehicle based solely on a general description of the vehicle; (2) the evidence was insufficient to establish his identity as the perpetrator of the episode involving four counts of attempted aggravated robbery and four counts of aggravated assault; and (3) the trial court erred by allowing the State to impeach a co-defendant with a prior statement because the jury was unlikely to consider the prior statement only for credibility purposes given the prejudicial nature of the statement. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Sherif Guindi, Knoxville, Tennessee, for the appellant, Eli Kea.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Charme P. Allen, District Attorney General; and Ashley D. McDermott and Leland L. Price, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

This case involves three separate incidents that occurred on the east side of Knoxville between the hours of 1:00 a.m. and 3:00 a.m. on January 13, 2017. For these crimes, on July 19, 2017, the Knox County Grand Jury returned a sixteen-count indictment against the Defendant, Richard Wynn, and Destin McMillan based upon their respective involvement.

## I. Pre-trial proceedings

Relative to the first of the three episodes, the Defendant, solely, was charged in Counts 1 and 2 with the aggravated assault of Titus Ware (alternatively, by using or displaying a deadly weapon); in Counts 3 and 4 with the attempted aggravated robbery of Titus Ware (alternatively, by violence or putting in fear); in Counts 5 and 6 with the aggravated assault of Kovacs Jefferson (alternatively, by using or displaying a deadly weapon); and in Counts 7 and 8 with the attempted aggravated robbery of Kovacs Jefferson (alternatively, by violence or putting in fear). See Tenn. Code Ann. §§ 39-12-101(a) (criminal attempt), -13-102(a)(1)(A) (aggravated assault), -13-402(a)(1) (aggravated robbery). Relative to the second episode, the Defendant and both co-defendants were charged in Count 9 with the aggravated assault of Melissa Everette by using a deadly weapon, a crime of force or violence that was committed while acting in concert with two or more persons; in Count 10 with the attempted first degree premeditated murder of Melissa Everette; and in Count 11 with employing a firearm during the attempted commission of a dangerous felony, that felony being the attempted first degree murder of Melissa Everette. See Tenn. Code Ann. §§ 39-12-101 (criminal attempt), -12-301 (defining acting in concert and crime of force or violence), -12-302 (classification of crime of force or violence committed while acting in concert), -13-102(a)(1)(A) (aggravated assault), -13-202(a)(1) (first degree premediated murder), -17-1324(b)(2) (employing a firearm during the attempted commission of a dangerous felony). Finally, relative to the third episode, the Defendant and both co-defendants were charged in Count 12 with the attempted first degree premeditated murder of Rochelle Evans; in Count 13 with employing a firearm during the attempted commission of a dangerous felony, that felony being the attempted first degree murder of Rochelle Evans; and in Counts 14 and 15 with reckless endangerment of another by discharging a firearm into an occupied habitation (alternatively, by placing another in imminent danger of death or of serious bodily injury). See Tenn. Code Ann. §§ 39-13-103 (reckless endangerment), -13-202(a)(1) (first degree premediated murder), -17-1324(b)(2) (employing a firearm during the attempted commission of a dangerous felony). The Defendant was not included in Count 16, which involved only co-defendant Wynn's being charged with evading arrest. See Tenn. Code Ann. § 39-16-603(a).

Prior to the Defendant's case proceeding to trial, the Defendant filed a motion to suppress the evidence obtained from the PT Cruiser in which he was a passenger before

- 2 -

his arrest in the early morning hours of January 13, 2017, arguing that the officers lacked reasonable suspicion for an investigatory stop of the vehicle. According to the Defendant, "[a] description of a car used in an alleged crime as being a white, or cream-colored, or gray PT Cruiser [was] not sufficiently specific and articulable to reasonably warrant the intrusion of a traffic stop" of the vehicle in which he was riding, though it matched this general description, without more. He requested suppression of "all evidence obtained by this illegal seizure, including, but not limited to, the physical evidence found in the vehicle and the identity and subsequent statements or testimony of its occupants."

Hearings were held on the motion on September 4, 2018, and October 5, 2018. In an oral ruling from the bench at the October hearing, the trial court denied the motion. Thereafter, a minute entry was entered to that effect. The Defendant proceeded to a five-day jury trial in November 2019.[1]

## II. Trial

A. First Episode. Titus Ware testified that during the early morning hours of January 13, 2017, he and his neighbor, Kovacs Jefferson, who both lived in the Austin Homes neighborhood, were standing in front of Mr. Ware's car talking. Mr. Ware noticed a man wearing an "orange type puffy coat" walking around the complex. Mr. Ware remarked that he thought this was unusual because it was not cold outside that evening and given the time of night. Mr. Ware was asked to describe the coat further; he stated, "It looked like as if it was one of those big poncho coats that's orange and it got [sic] like a little hood on it. . . . Probably almost like pants level. . . . Almost like a trench coat maybe." After being shown a photograph of the red coat found inside the PT Cruiser following the investigatory stop, Mr. Ware identified the coat as similar to the assailant's, stating, "It was a coat like that."

Mr. Ware explained that the assailant first walked past them and was out of sight before the assailant returned and pulled a gun on the pair; according to Mr. Ware, the gun was black with an extended clip. Upon seeing the gun, Mr. Ware and Mr. Jefferson fled, running in different directions. The assailant pursued Mr. Ware and ultimately caught up with him. After catching up with Mr. Ware, the assailant pointed the gun at Mr. Ware and demanded that he "give it up." Mr. Ware told the assailant that he did not have anything to give him. Mr. Ware said that after hearing this, the man just stared at him and then walked away.

Mr. Ware said that he was unable to see the assailant's face because the man was wearing a mask. However, Mr. Ware was familiar with the Defendant, who used to live

---

[1] The Defendant and co-defendant Wynn were tried jointly. Co-defendant McMillan's case had been severed, and she testified against the defendants at trial.

several apartments down from Mr. Ware in Austin Homes, and Mr. Ware opined that the masked man was the same build, height, and weight as the Defendant.

Mr. Ware confirmed that he placed a call to 911 at 1:36 a.m. During the call, Mr. Ware, who could be heard breathing heavily, told the dispatcher that he had an emergency, but he then said not to worry about it and hung up. When the 911 dispatcher called Mr. Ware back at 1:41 a.m., Mr. Ware said that a man had robbed him and a friend of his, but Mr. Ware would not identify himself for the dispatcher. At trial, Mr. Ware explained that he hung up because he wanted the police to arrive as quickly as possible. When the authorities arrived later, Mr. Ware gave a statement about the events.

Kovacs Jefferson also testified at the Defendant's trial, providing similar testimony to Mr. Ware. Mr. Jefferson confirmed that while he was talking to Mr. Ware, "someone walked up" and pointed a gun at them, asking the pair to give up "what [they] had," and that in response, he and Mr. Ware both ran in opposite directions. In addition, Mr. Jefferson stated that after these events, he was thankful he was not hurt. Like Mr. Ware, Mr. Jefferson did not see the assailant's face; he said that the assailant was wearing an orange coat; and he described the gun as dark-colored and "semi-automatic." Mr. Jefferson was also shown a picture of the coat found in the PT Cruiser, but he could not identify it.

Mr. Jefferson confirmed that he likewise placed a 911 call about the incident, wherein he identified himself and reported the events to the dispatcher. In the call, which was received by 911 at 1:36 a.m., Mr. Jefferson said that a Black male attempted to rob them and that the assailant was wearing a long, orange coat with a hood. During the call, Mr. Jefferson described the gun as black and "semi-automatic."

B. Second Episode.[2] The victim of the second episode, forty-nine-year old Melissa Everette, had died before the Defendant's trial. A recording of her preliminary hearing testimony was played for the jury as substantive proof.

Ms. Everette testified that in the early morning hours of January 13, 2017, she was visiting a friend who lived on Magnolia Avenue. Ms. Everette acknowledged that she had been drinking "quite a bit" on this occasion when she left her friend's residence and began walking towards her residence on the twenty-eight-hundred block of Linden Avenue. As she crossed Magnolia, she noticed a white vehicle driving towards her in the turning lane. According to Ms. Everette, the vehicle had its turn signal activated and approached her at an average rate of speed. She explained that as the vehicle was coming towards her, she saw the driver's side door of the vehicle open and immediately heard three gunshots. When Ms. Everette heard three more gunshots, she dropped to the ground, and the car sped off.

---

[2] It is not clear whether the second or third episode occurred first in time. Because the defendants were charged with the crimes against Melissa Everette first, we will refer to this as the second episode.

Ms. Everette explained that the vehicle turned right off of Magnolia at the corner of the intersection where the Deluxe Motel was located, subsequently identified as the Hembree Street intersection, and that the vehicle was heading in the direction of 5th Avenue.

When Ms. Everette, who was wearing flip-flops, stood up, she noticed that her foot was bleeding. She felt intense pain in her foot as she continued to walk, to the point that she became nauseated. After hobbling home, Ms. Everette examined the wound, which continued to bleed profusely, and saw that there was a bullet lodged in her toe. Ms. Everette estimated that she was shot about one to one and one-half blocks from the intersection of Martin Luther King, Jr. Avenue ("MLK") and Cherry Street; the location of the third episode.

Once at her home, Ms. Everette called 911. During the 911 call placed at 3:03 a.m., Ms. Everette informed the dispatcher that she was crossing Magnolia when a white four-door vehicle approached. According to Ms. Everette, she saw the vehicle's door open, heard four to six shots, and then realized that she had been shot in the foot. She described the car as a newer model white four-door vehicle, "not really an SUV," more of "a coupe-like car." Ms. Everette could not identify any occupants of the vehicle.

After calling 911, the police arrived at Ms. Everette's home, and she spoke with Knoxville Police Department ("KPD") Officer Ian Green. She was then transported to the emergency room at University of Tennessee Hospital. Once at the hospital, the police showed Ms. Everette several pictures of different vehicles, and she picked out the Defendant's vehicle. In addition, it was determined that the middle bone in Ms. Everette's big toe was shattered, and she underwent surgery, requiring two days' hospitalization. Later while Ms. Everette was recuperating at home, a pin placed in her foot during surgery dislodged and became infected; she spent an additional seven days in the hospital recovering from the infection.

Officer Green also testified at the Defendant's trial. Officer Green confirmed that he responded to Ms. Everette's residence on Linden Avenue following her 911 call. He estimated that her residence was about two blocks south from where she said the shooting happened. Once at the residence, Officer Green observed that Ms. Everette had been shot in the right foot, with the bullet still lodged in her big toe. According to Officer Green, the victim was bleeding, crying, and holding her leg, and she appeared to be in pain. Officer Green identified photographs of Ms. Everette's injuries.

In addition, KPD crime scene investigator Russell Whitfield recovered four "spent" 9mm shell casings from Hembree Street. These shell casings were found at 8, 17, 18, and 26 yards, respectively, from Magnolia Avenue, which in Investigator Whitfield's opinion, meant that the "gun [was] moving" when it was fired. Also, at this intersection was an apartment complex known to some as the "Bricks."

C. <u>Third Episode</u>. A third incident occurred in the early morning of January 13, 2017. On that date, Rochelle Evans lived on the twenty-six-hundred block of MLK, and Ms. Evans's house was located on the corner of the MLK and Cherry Street intersection. Ms. Evans testified that she lived there along with her two adult sons. During the early morning hours, Ms. Evans put her three-year-old grandson, who was visiting, to bed in the living room. A man named Chris Smith was visiting as well. After putting her grandson to bed, Ms. Evans returned to her room where she heard gunshots and something hitting the house. She confirmed that it was dark in the living room at that time.

Because there had been shootings at the house previously, Ms. Evans had a security camera set up outside her home. When one of Ms. Evans's sons examined the camera footage, he discovered that a vehicle had driven by and that someone from inside the vehicle was shooting at the house. Upon further examination of the living room, they noticed that at least one shot had struck the house and penetrated a living room wall near where the grandson had been sleeping. According to Ms. Evans, the bullet travelled through the living room and was lodged in an opposite wall.

At 2:32 a.m., a woman named Michelle[3] called 911. Michelle reported that she heard about six gunshots "out front" of her residence, which was also located on the twenty-six-hundred block of MLK.[4] She could not provide any further information.

Ms. Evans called 911 at 2:36 a.m. She reported to the dispatcher what she had seen on camera, that being someone from inside a white or cream-colored PT Cruiser fired gunshots at her home. She told the dispatcher not to send anyone to her house because they were fine, but to instead focus on finding the vehicle. Nonetheless, KPD Sergeant Chris Bell arrived at Ms. Evans's house shortly thereafter and viewed the recording. Ms. Evans also gave the recording to law enforcement.

The video[5] depicted a white PT Cruiser driving southbound on Cherry Street towards its intersection with MLK. As the vehicle approached the stop sign, flashes of light could be seen emanating from behind the driver's seat of the vehicle and debris falling from the house as the shots impacted it. According to the footage, the shots at Ms. Evans's

---

[3] She did not provide her last name.

[4] On some occasions in these proceedings, it was stated that this 2:32 a.m. call from Michelle related to the shooting of Ms. Everette while she walking down Magnolia. However, based upon our review of the evidence in the record, which included large maps, we can confidently say that this call related to the shooting at Ms. Evans's house that was located at the intersection of MLK and Cherry Street. Both of these residences are located on the twenty-six-hundred block of MLK, and the 911 dispatch report indicates Cherry Street as cross street for Michelle's address on MLK.

[5] The recording shown at trial was apparently darker than the original footage.

house were fired at 2:30 a.m. The occupants of the vehicle were unidentifiable from the video.

At trial, Ms. Evans testified that she did not know either of the defendants. Ms. Evans also estimated that the intersection of Hembree Street and Magnolia Avenue, the location of the second incident, was "not far" from her residence, being approximately two minutes away.

Sergeant Bell also testified at the Defendant's trial. According to Sergeant Bell, he arrived at Ms. Evans's house at approximately 2:40 a.m. Ms. Evans immediately provided Sergeant Bell with a description of the vehicle. Because dispatch had apparently failed to relay this information, Sergeant Bell "immediately broadcasted" the vehicle's description over the radio.

Sergeant Bell then reviewed the surveillance video footage with Ms. Evans's assistance. According to Sergeant Bell, the video showed that shots were fired from the rear of the driver's side of the vehicle, that it looked as if at least two shots were fired from the vehicle, and that debris fell from the house when it was struck. He confirmed that none of the vehicle's occupants were identifiable on the recording.

Two spent shell casings were also found outside of Ms. Evans's residence. Sergeant Bell found one 9mm casing in the middle of the street, and Investigator Whitfield found a second in the street.

D. Traffic Stop. KPD Sergeant Nathaniel Skellenger was a night-shift patrol officer in East Knoxville on January 13, 2017. Sergeant Skellenger estimated that it would take approximately one minute to travel from the intersection of Magnolia and Hembree to the intersection of MLK and Cherry Street. He further estimated that it would take about four to five minutes to drive from the MLK and Cherry Street intersection to the Austin Homes neighborhood.

Sergeant Skellenger testified that following the second episode at Ms. Evans's home, law enforcement put out a "be on the look out" ("BOLO") for a white PT Cruiser. A "short time" after receiving this information, Sergeant Skellenger was approaching Magnolia when he encountered the white PT Cruiser in which the Defendant was riding as a passenger. According to Sergeant Skellenger, it was the "only vehicle on the road at that time." Sergeant Skellenger's cruiser's video reflected that he encountered the vehicle at 3:02 a.m., at which time he began following it.

Because Sergeant Skellenger believed the vehicle's occupants had just been involved in a shooting, he waited for more units to arrive before initiating the traffic stop. At 3:03 a.m., Sergeant Skellenger activated his blue lights. At this time, the vehicle had

reentered the Austin Homes neighborhood. Once the car was blocked in by law enforcement, two of the occupants fled—the driver, co-defendant McMillan, and the backseat passenger, co-defendant Wynn—but the front seat passenger, the Defendant, initially stayed in the vehicle. Sergeant Skellenger initially pursued co-defendant McMillan, but he noticed that the Defendant had exited the vehicle and started to walk away. Sergeant Skellenger pushed co-defendant McMillan to the ground and returned to try and apprehend the Defendant.

KPD Officer Nelson Hamilton pursued co-defendant Wynn as he attempted to flee. During the pursuit, co-defendant Wynn dropped a handgun, as well as a magazine, in the street, which Officer Hamilton seized. Once apprehended, co-defendant Wynn was placed in the back of Officer Hamilton's patrol car. Officer Hamilton's cruiser's video captured a "stay silent" comment made by co-defendant Wynn as they neared the car in which the Defendant was being placed; Officer Hamilton interpreted this comment as co-defendant Wynn's urging the Defendant "to cover up" their crimes and not to provide the police with any details.

Ultimately, all three defendants were apprehended by the police and taken into custody. Upon a subsequent search of the PT Cruiser, law enforcement recovered from the backseat a hooded, red puffer-type coat and a box of 9mm ammunition, which held fifty bullets but contained only thirty. A blue sweatshirt-type jacket was found on the passenger's side floorboard. Furthermore, they also found two spent 9mm shell casings inside the vehicle on the driver's side floorboard. Investigator Whitfield noted that in semi-automatic handguns, casings were generally ejected to the right.

Sergeant Skellenger said that prior to the traffic stop, there were very few other vehicles on the road at that time of night. Sergeant Skellenger also testified that he remembered seeing the PT Cruiser earlier in the evening at a gas station at the intersection of Dandridge and Wilder.

E. Co-defendants' testimony. Co-defendant McMillan testified that during the early morning hours of January 13, 2017, she and the Defendant, to whom she was engaged at the time, were travelling around Knoxville after the Defendant had picked her up from her aunt's house in a white PT Cruiser. The two drove around and drank for some time before the Defendant announced that he wanted to purchase some marijuana; co-defendant McMillan further admitted that she had taken Xanax that evening. According to co-defendant McMillan, the Defendant said that he was going to "slide" to East Knoxville and get some marijuana, which co-defendant McMillan explained was a slang term for robbing someone. She did not recall the Defendant's having any money. Co-defendant McMillan drove the PT Cruiser to the Austin Homes neighborhood of Knoxville and parked. Co-defendant McMillan averred that she remained in the car, while the Defendant got out and

was gone for approximately ten to fifteen minutes; however, he did not return with any marijuana.

When co-defendant McMillan was asked what the Defendant was wearing that evening when the Defendant exited the vehicle and went inside Austin Homes, she initially did not recall. After her recollection was refreshed with her prior "testimony,"[6] she said, "It was a jacket. It was kind of thicker. Not too thick. It was like—I don't know, like—I don't know. Kind of like this material. And I think it was like a dark blue though." Co-defendant McMillan said that the blue jacket found in the PT Cruiser's passenger's side floorboard belonged to her and that the Defendant "might have been" wearing it at that time. She did not recognize the red coat found inside the PT Cruiser and had "no idea" how it got there. Co-defendant McMillan was asked if she recalled previously telling KPD Investigator Jeff Day that the Defendant was wearing a red coat that evening, and she said that she did not remember making any such statement.

Co-defendant McMillan explained that after stopping in Austin Homes, the Defendant began driving the PT Cruiser, and they headed towards the Bricks apartment complex, which was off Magnolia and Hembree. According to co-defendant McMillan, she and the Defendant were at the Bricks apartment complex because that was where co-defendant McMillan's ex-boyfriend, Michael Ford, lived. The pair had been quarreling with Mr. Ford that evening about some money he allegedly owed to co-defendant McMillan. Co-defendant McMillan said that she was riding in the passenger seat looking at her cellphone as they passed Magnolia when she heard four or five gunshots go off by her left ear and that the shots surprised and scared her. She subsequently stated that she saw the driver's side door open as the shots were fired, indicating that the Defendant fired the shots.

Co-defendant McMillan confirmed that she and the Defendant were joined by co-defendant Wynn at some point in the evening. Co-defendant McMillan testified that co-defendant Wynn had a gun in his pocket when they picked him up, though she later acknowledged that a weapon was already inside the vehicle. She also said that there had been some communications that evening between co-defendant Wynn and the Defendant about co-defendant Wynn's bringing extra ammunition and that she believed that co-defendant Wynn brought the box of ammunition found in the backseat. Co-defendant McMillan recalled that co-defendant Wynn was with them when Ms. Everette was shot and when shots were fired at Ms. Evans's home. According to co-defendant McMillan, she was driving at the time shots were fired at the residence on MLK. Co-defendant McMillan testified that as they passed the house, she heard multiple gunshots come from

---

[6] It is unclear from the record when this prior "testimony" took place.

the backseat of the driver's side, the location in which co-defendant Wynn was sitting. She explained that both men provided her with directions to the home on MLK.

A jail call between co-defendant McMillan and the Defendant was played for the jury. During the call, the Defendant instructed her not to say anything incriminating.

Co-defendant McMillan agreed that she had given several different versions of the events. She confirmed that she had done so at times because she was trying to protect the Defendant.

Co-defendant Wynn testified that he lived in the "Inskip" area of Knoxville, which was on the northside, and that the Defendant was driving when they picked him up from his house between 2:00 a.m. and 2:05 a.m. on January 13, 2017. Co-defendant Wynn indicated that after they picked him up, the group stopped at a Pilot gas station on Merchants Drive, and he estimated that it took four to five minutes to get from his house to the gas station. Co-defendant Wynn affirmed that the group then travelled to East Knoxville once they left the gas station. He estimated that it took between fifteen and twenty minutes to go from the gas station to MLK on the east side.

Co-defendant Wynn acknowledged that he shot at the house on MLK, though he denied knowing anyone was inside. However, he stated that he was not present for the shooting of Ms. Everette on Magnolia and Hembree. He also asserted that the handgun was already in the PT Cruiser when he got inside and that he did not bring the box of ammunition.

F. Statements. Investigator Day testified. On January 13, 2017, Investigator Day first went to visit Ms. Everette at the hospital where he observed Ms. Everette's injuries and took a statement from her about what happened. After Ms. Everette described the vehicle to Investigator Day, he showed her a photograph that had been sent from patrol officers on the scene, and she said that the PT Cruiser looked like the vehicle involved in her shooting. According to Investigator Day, the location where Ms. Everette was shot was probably less than one-quarter of one mile from Ms. Everette's house on Linden Avenue.

Investigator Day then interviewed all three defendants. The Defendant told Investigator Day that he was in Austin Homes on January 13 to visit his family, who lived in the neighborhood. He denied robbing anyone. During co-defendant's Wynn interview, he denied ever shooting anyone.

Relative to co-defendant McMillan, Investigator Day testified that during her interview, she told him that the Defendant was wearing a red, puffy coat on January 13 when he exited the vehicle and went inside Austin Homes. According to Investigator Day,

he was unaware that a red coat had been found inside the PT Cruiser at that time; thus, he had not mentioned anything about a red coat to co-defendant McMillan.

During Investigator Day's testimony, the State sought to play this portion of co-defendant McMillan's interview concerning the red coat, as well as seeking to play other portions of her interview. The Defendant raised several objections to co-defendant McMillan's interview being played, and specifically with regard to the red coat statement, the Defendant argued that it would be difficult for the jury not to view this inconsistent statement as substantive proof given the prejudicial nature of the statement. Over the Defendant's objection, the trial court allowed the red coat portion of co-defendant McMillan's interview to be admitted for impeachment purposes as a prior inconsistent statement.

During the portion of Investigator's Day testimony when he discussed co-defendant McMillan's interview, the trial court instructed the jury several times that co-defendant McMillan's statements on the recording were not to be considered as substantive evidence. Specifically, with regard to the red coat statement, the trial court instructed as follows:

> What she testified to yesterday was that he was wearing a blue jacket. That is the substantive proof. You may consider the fact that she has made this statement on another occasion only as to how it affects her credibility as a witness yesterday. Does everybody understand that distinction? What she testified to yesterday that he was wearing something blue is the proof in front of you.

Later in his testimony, Investigator Day confirmed that co-defendant McMillan had given three different statements and that all had several inconsistencies with each other.

In addition, Investigator Day stated that he was informed that the group, while they were riding around on the evening in question, visited a Pilot gas station on Merchants Drive on the east side of 1-75. Investigator Day obtained video footage from that gas station. From the video, Investigator Day saw that at 2:11 a.m. on January 13, 2017, the white PT Cruiser pulled into the Pilot Station, that the Defendant was driving at that time, that the Defendant got out and pumped gas, that co-defendant McMillan was seated on the passenger's side, that she got out of the vehicle at one point, and that a third individual was seated in the vehicle in the backseat behind the driver, though this individual never got out of the car. The group left the gas station at 2:14 a.m. According to Investigator Day, the gas station was about six miles from Magnolia Avenue, and it would take roughly thirteen minutes to travel from the gas station to the east side of town.

G. Forensics. The gun recovered from co-defendant Wynn was a Hi-Point 9mm handgun with an extended magazine; it had one round loaded in the chamber and ten rounds

in the magazine. Laboratory testing of the eight 9mm shell casings recovered from the two shooting sites, as well as the two shell casings found inside the vehicle on the driver's side floorboard, revealed that all the casings were ejected from the Hi-Point 9mm handgun dropped by co-defendant Wynn. Also, the spent shell casings were of the same brand as most of the rounds found in the box of 9mm ammunition in the backseat of the PT Cruiser.

*III. Verdict and Sentencing*

Following the conclusion of proof, the Defendant was found guilty as charged of Counts 1 through 8, involving the aggravated assaults and attempted aggravated robberies of Titus Ware and Kovacs Jefferson, all Class C felonies. See Tenn. Code Ann. §§ 39-12-107(a) (criminal attempt classification), -13-102(e)(1)(A) (aggravated assault classification), -13-402(b) (aggravated robbery classification). The convictions in Counts 1, 2, and 4 were merged with the attempted aggravated robbery conviction and six-year sentence imposed for Count 3; all counts relative to the victim Titus Ware. Similarly, the convictions in Counts 5, 6, and 8 were merged with the attempted aggravated robbery conviction and six-year sentence imposed for Count 7; all counts relative to the victim Kovacs Jefferson. The six-year sentences in Counts 3 and 7 were ordered to be served concurrently with one another.

Relative to Count 9, involving the aggravated assault of Melissa Everette while acting in concert with two or more persons, the Defendant was found guilty of the lesser-included offense of reckless aggravated assault, a Class D felony. See Tenn. Code Ann. § 39-13-102(a)(1)(B) (reckless aggravated assault), (e)(1)(A) (classification). The Defendant received a four-year sentence for this conviction, which was to be served consecutively to Count 3.

The Defendant was found not guilty of Counts 10 through 13. These counts involved the attempted first degree murder of Melissa Everette and the attempted second degree murder of Rochelle Evans,[7] as well as the respective charges for employing a firearm during the attempted commission of a dangerous felony.

Relative to Counts 14 and 15, involving the reckless endangerment of another by discharging a firearm into an occupied habitation, the Defendant was found guilty as charged, a Class C felony. See Tenn. Code Ann. § 39-13-103(b)(3) (reckless endangerment classification). The Defendant's convictions for these two offenses were merged into a

---

[7] Following the State's conclusion of proof, and upon the defendants' motion for a judgment of acquittal, the trial court reduced Count 12, involving Rochelle Evans, from attempted first degree murder to attempted second degree murder, finding the proof insufficient to support an attempted first degree murder charge. See Tenn. Code Ann. § 39-13-210(a)(1) (second degree murder). The trial court likewise changed the respective employing a firearm during the commission of a dangerous felony charge in Count 13 to delineate attempted second degree murder as the dangerous felony, instead of attempted first degree murder.

- 12 -

single count, Count 14, and he received a six-year sentence. The six-year sentence in Count 14 was ordered to be served concurrently with the six-year sentence in Count 3.

Ultimately, the Defendant received an effective sentence of ten years as a Range I, standard offender. Judgments for the convictions for which the Defendant was found guilty were entered on February 8, 2019. Thereafter, the Defendant filed a timely motion for new trial, which was denied. This appeal followed.

## ANALYSIS

On appeal, the Defendant contends that the trial court erred in denying his motion to suppress the evidence found as a result of the traffic stop because it was based only upon a general description of the vehicle, that there was insufficient evidence to establish the Defendant's identity as the perpetrator of the aggravated assaults and attempted aggravated robberies of Titus Ware and Kovacs Jefferson, and that the trial court erred by permitting the State to impeach co-defendant McMillan with her prior statement that the Defendant was wearing a red coat when he exited the vehicle and went inside Austin Homes because the jury was unlikely to consider the prior statement only for credibility purposes given the prejudicial nature of the statement. We will address each issue in turn.

### I. Motion to Suppress

The Defendant argues that Sergeant Skellenger did not have sufficient reasonable suspicion to initiate an investigatory stop of the PT Cruiser; therefore, the "initial illegal stop tainted the entire episode," and all evidence obtained through the illegal stop should have been suppressed. According to the Defendant,

> the description of a vehicle as a white PT Cruiser, or as a white or cream-color[ed] PT Cruiser, without any other identifying features whatsoever, was simply inadequate to give Knoxville Police Officers reasonable suspicion, supported by specific and articulable facts, that a criminal offense had been or was about to be committed by the occupants of the vehicle.

The State responds that Sergeant Skellenger had reasonable suspicion to perform an investigatory stop of the vehicle; thus, the initial seizure passed constitutional muster, and the trial court did not err by admitting all evidence obtained therefrom. Specifically, relative to reasonable suspicion, the State asserts that the circumstances, "when viewed in totality, provided [Sergeant] Skellenger with a specific and articulable suspicion that one of the occupants of [the] Defendant's vehicle had fired shots at either Everette or at Evans's house."

A. <u>Procedural History</u>. At the September 4, 2018 hearing on the Defendant's motion to suppress, both the Defendant's sister, Yasmine Anderson, and Sergeant Skellenger testified. Ms. Anderson stated she was in the process of buying the PT Cruiser from another individual on January 13, 2017.[8] At that time, she had not made any payments to the individual and did not have title to the vehicle. Ms. Anderson confirmed that she had loaned the vehicle to the Defendant on January 13, 2017.

Sergeant Skellenger reviewed the three incidents that took place during the morning hours of January 13, 2017, and the relevant 911 calls. Sergeant Skellenger indicated that he was aware of all of this information before he pulled over the PT Cruiser.

Sergeant Skellenger indicated that Sergeant Bell proceeded to Ms. Evan's home shortly after Ms. Evans's 911 call reporting shots fired at her residence and what she had seen on the surveillance footage. According to Sergeant Skellenger, Sergeant Bell put out a BOLO for a white or cream-colored PT Cruiser shortly after he arrived at Ms. Evan's home.[9] Sergeant Skellenger said that he saw the PT Cruiser about five to ten minutes thereafter travelling on Jessamine Street in the direction of Magnolia Avenue. According to Sergeant Skellenger, when he first encountered the suspect vehicle, he was about one and one-half or two miles away from MLK and Cherry Street, the location of Ms. Evans's home. According to his cruiser's video, Sergeant Skellenger encountered the PT Cruiser at 3:02 a.m. Because Sergeant Skellenger saw multiple occupants in the vehicle, and because he believed the occupants to have been involved in criminal activity, he waited for more units to arrive before initiating the traffic stop. At 3:03 a.m., Sergeant Skellenger activated his blue lights, and the PT Cruiser was then blocked in by police cars in both directions. The defendants were subsequently arrested.

Sergeant Skellenger stated that the first incident of an attempted robbery occurred earlier that evening in the Austin Homes neighborhood, which was where he eventually stopped the PT Cruiser. Moreover, Sergeant Skellenger estimated that all three episodes occurred "very close together," happening within a two- or three-square-mile radius. Sergeant Skellenger said that prior to the traffic stop, there were no other vehicles on the road. Sergeant Skellenger further testified that he had seen the vehicle earlier in the day and that it stuck in his mind because there were few cars out and there were not a lot of PT Cruisers in the area.

---

[8] The Defendant's standing to challenge the stop was also at issue.

[9] Sergeant Skellenger's testimony at the suppression hearing indicated that Sergeant Bell gave this description of the vehicle after Sergeant Bell had viewed the recording himself, though Sergeant Bell's testimony at trial indicated otherwise. Sergeant Bell testified at trial that he gave the BOLO after speaking with Ms. Evans and that he subsequently saw the recording.

In the trial court's oral ruling from the bench denying the motion, the trial court determined that there were "sufficient facts in [the] record that justified the initial investigative detention." The trial court noted that at the time of the stop, Sergeant Skellenger encountered a vehicle that "matched identically" the description Sergeant Bell had relayed to him. The trial court continued, "It's obvious that this particular vehicle is connected with the allegations involving the shooting at the house. I mean, you can see activity going—sparks flying where the rounds are hitting the house when you're watching the surveillance video." The trial court further commented that Sergeant Skellenger encountered the vehicle within close proximity to and within a short period of time after the shooting at Ms. Evans's residence, as well at a time of day when not many other vehicles were on the road.

B. Applicable Law and Analysis. On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008) (citing State v. Scarborough, 201 S.W.3d 607, 615 (Tenn. 2006)). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. (citing State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007)). Conversely, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id. (citing State v. Hayes, 188 S.W.3d 505, 510 (Tenn. 2006)). In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution guarantee the right to be free from unreasonable searches and seizures. A vehicle stop and detention of the vehicle's occupants constitutes a seizure under both constitutions. Whren v. United States, 517 U.S. 806, 809-10 (1996); State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000). In the context of a traffic stop, a person is seized when the officer activates the cruiser's blue lights. Binette, 33 S.W.3d at 218. Generally, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 630 (Tenn. 1997). The State has the burden to demonstrate, by

- 15 -

a preponderance of the evidence, that a warrantless search passes constitutional muster. State v. Harris, 280 S.W.3d 832, 839 (Tenn. Crim. App. 2008).

This case involves a brief investigatory detention, which occurred when Sergeant Skellenger pulled over the PT Cruiser being driven by co-defendant McMillan. A warrant is not required for an investigatory stop "when the officer has a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." State v. Bridges, 963 S.W.2d 487, 492 (Tenn. 1997); see also Terry v. Ohio, 392 U.S. 1, 21 (1968); Binette, 33 S.W.3d at 218; Yeargan, 958 S.W.2d at 630. Reasonable suspicion is a lower standard of proof than probable cause, but it must be more than the officer's "inchoate and unparticularized suspicion or hunch.'" State v. Hanning, 296 S.W.3d 44, 49 (Tenn. 2009) (quoting State v. Day, 263 S.W.3d 891, 902 (Tenn. 2008)). Our supreme court has explained that reasonable suspicion is "a particularized and objective basis for suspecting the subject of a stop of criminal activity." Binette, 33 S.W.3d at 218. Reasonable suspicion exists when "specific and articulable facts . . . taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21.

The trial court's determination of whether a police officer's reasonable suspicion is supported by specific and articulable facts is an objective, fact-intensive inquiry. State v. Davis, 354 S.W.3d 718, 727 (Tenn. 2011). It requires the court to consider the totality of the circumstances established by the proof. Day, 263 S.W.3d at 903. These circumstances include, but are "not limited to, objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders." State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992).

In the present case, the trial court found that Sergeant Skellenger articulated a reasonable suspicion for making an investigatory stop of the PT Cruiser, and we agree. On the morning of January 13, 2017, Sergeant Skellenger had received a BOLO dispatch for a white or cream-colored PT Cruiser believed to be involved in the shooting at Ms. Evans's house. According to Sergeant Skellenger, Sergeant Bell put out a description of the vehicle shortly after arriving at Ms. Evans's home. At trial, Sergeant Bell testified that he arrived at Ms. Evans's house at approximately 2:40 a.m. and that after speaking with Ms. Evans, he immediately sent the vehicle's description over the radio. Sergeant Skellenger said that he saw the PT Cruiser about five to ten minutes later only about one and one-half or two miles away from MLK and Cherry Street, the location of Ms. Evans's home. Sergeant Skellenger's cruiser's video confirmed that he encountered the PT Cruiser at 3:02 a.m. and initiated the traffic stop shortly thereafter at 3:03 a.m. Sergeant Skellenger further explained that there were very few cars on the road that morning, that PT Cruisers were not very common cars in the area, and that he remembered, due to the vehicle's unpopularity, seeing the vehicle earlier in the evening.

We conclude that in the present case, Sergeant Skellenger had reasonable suspicion to make a brief investigatory stop based on these factors[10]: (1) Ms. Evans reported that her house had been fired upon, that she had surveillance equipment, and that she had viewed the recording and saw shots fired from a white or cream-colored PT Cruiser; (2) the location where Sergeant Skellenger observed the vehicle was in close proximity to Ms. Evans's home, and only a short period of time had elapsed between Ms. Evan's report and Sergeant Skellenger's observation of the vehicle; (3) Sergeant Skellenger testified that there were few other cars on the road at that time and that PT Cruisers were not common in the area; and (4) the level of danger in this situation was apparent, and Sergeant Skellenger had a reasonable basis for assuming the suspects in the PT Cruiser were armed and dangerous and had fired from inside their vehicle. See State v. Pulley, 863 S.W.2d 33, 39 (Tenn. 1993) (observing that "the gravity of the perceived harm is a crucial element in assessing the reasonableness of an investigative Terry stop"); State v. Albert Seals, Jr., No. 03C01-9512-CC-00396, 1997 WL 215883, at *2 (Tenn. Crim. App. Apr. 28, 1997) (stating that the investigatory stop was supported by specific and articulable facts when the defendant's car matched the general description given by witnesses at the Huddle House who had observed a disturbance involving three allegedly intoxicated individuals, only a short period of time transpired between the original dispatch and the observation of the vehicle, and the defendant was operating his vehicle at an extremely slow rate of speed given the time of night and the posted speed limit); State v. Dwight Rhoten, No. 03C01-9210-CR-00367, 1993 WL 195224, at *2 (Tenn. Crim. App. June 9, 1993) (finding that the investigatory stop was supported by specific and articulable facts when the police received a report around 3 a.m. from a specific complainant concerning an attempted break-in at her apartment, a general description of the vehicle driven by the culprit was given, and shortly thereafter, the defendant was observed driving a vehicle that generally matched that description as he exited the only road accessing the apartment complex); see also United States v. Roberts, 787 F.3d 1204, 1210 (8th Cir. 2015) (determining that the officer had reasonable suspicion to stop defendant's black Chrysler where the defendant's vehicle matched the description of a vehicle seen fleeing the scene of a shooting, and was stopped seven blocks away from the scene of the crime moments after it occurred); United States v. Witt, 494 Fed. Appx. 713, 716 (8th Cir. 2012) (holding that reasonable suspicion existed for a stop of the defendant's green station wagon, where officers who had received a radio dispatch about an armed bank robbery, which included a description that the suspect was believed to be driving a "dark green or black station wagon," stopped the only vehicle they saw in rural Nebraska which fit that description, traffic had been light that morning, the station wagon was driving away from the site of the robbery, and the spot where it was stopped, approximately one hour after the robbery, was about a one-hour drive away from

_____

[10] As did the trial court, we will limit our analysis to reasonable suspicion that the vehicle was involved in the shooting at Ms. Evans's residence. We do so because, based upon the evidence in the record, the first incident at Austin Homes did not involve a description of a vehicle and Ms. Everette did not place her 911 call until 3:03 a.m., which was after the traffic stop had already been initiated.

the robbery site). Accordingly, the trial court did not err in denying the Defendant's motion to suppress.

## II. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions for the four counts of aggravated assault and four counts of attempted aggravated robbery relative to the first episode at Austin Homes because his identity as the perpetrator of these offenses was not adequately established.[11] Specifically, he states,

> Th[e] lack of identification of the coat, the fact that neither victim saw their assailant's face, and the fact that [the Defendant] had family and used to live in Austin Homes and was there earlier but no time was given, is simply not enough for any rational trier of fact to find that [the Defendant] was identified as the assailant beyond a reasonable doubt.

The State responds that the evidence is sufficient.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; see also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

---

[11] The Defendant does not challenge the sufficiency of the evidence supporting his other convictions.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference[.]" Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

"The identity of the perpetrator is an essential element of any crime." State v Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as a perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). Identity may be established by either direct evidence or circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793; see also State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010). The identification of the defendant as a perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).

First, we observe that the Defendant goes through some lengths to discredit co-defendant McMillan's testimony, noting that she did not provide a specific time that the pair were in the Austin Homes neighborhood and that she gave multiple inconsistent statements. He also comments that Mr. Jefferson was unable to identify the red coat when he was shown it in court, that the red coat was found in the backseat where co-defendant Wynn was sitting at the time of stop, and that the Defendant's appearance had changed by the time of trial.[12] The determination of issues of witness credibility and the resolution of conflicts in testimony rest squarely within the province of the jury. Bland, 958 S.W.2d at

---

[12] In making this argument, the Defendant relies upon the trial court's statement during a jury-out hearing that the Defendant was "a lot thicker" at the time of trial than he was on January 13, 2017. By pointing out the trial court's statement, the Defendant attempts to discredit Mr. Ware's in-court identification of the Defendant.

659.  Moreover, the jury was free to reject some portions of co-defendant McMillan's testimony while accepting others.  State v. Bolin, 922 S.W.2d 870, 875 (Tenn. 1996) (holding that juries are "free to believe only part of a witness' testimony").

Despite the Defendant's assertions to the contrary, we believe that the State presented sufficient evidence to establish the Defendant's identity.  Co-defendant McMillan testified that the Defendant told her that he was going to "slide" to East Knoxville and get some marijuana, which co-defendant McMillan asserted was a slang term for robbing someone.  She also said that the Defendant did not have any money at that time, inferring that he would have no other way to obtain marijuana other than by robbing someone.  According to co-defendant McMillan at trial, they drove to Austin Homes and parked, and the Defendant exited the car wearing a dark blue jacket and was gone for about ten to fifteen minutes; however, her statement about the color of the jacket or coat the Defendant was wearing was later impeached by her previous statement to Investigator Day.  The Defendant, in his statement to Investigator Day, acknowledged that he was in the area, though he claimed to be visiting family.

Moreover, though co-defendant McMillan did not provide a specific time placing the Defendant in the Austin Homes neighborhood at the exact time of the robbery, she did provide a sequence of events that circumstantially placed them in the Austin Homes neighborhood at that time.  Both Mr. Ware's and Mr. Jefferson's initial phone calls to 911 were placed at 1:36 a.m.  Co-defendant McMillan confirmed that co-defendant Wynn was not with her and the Defendant when they went to Austin Homes and that thereafter, they went to co-defendant Wynn's home in North Knoxville to pick him up.  Co-defendant Wynn indicated that they arrived at his house between 2:00 a.m. and 2:05 a.m. and that after they picked him up, they stopped at a Pilot gas station on Merchants Drive, which was only about four to five minutes away from his house.  Investigator Day obtained video footage from the Pilot.  From the video, Investigator Day saw the white PT Cruiser arrive at 2:11 a.m., and all three members of the group were inside the vehicle at that time.  Co-defendant Wynn confirmed that they left the gas station and proceeded to the east side of Knoxville.   He estimated that it took between fifteen and twenty minutes to get from the gas station to MLK on the east side.

Furthermore, both Mr. Ware and Mr. Jefferson indicated that the assailant was wearing a hooded, orange puffy coat.  A hooded, red puffer-type coat was found in the backseat of the PT Cruiser, and there was evidence that the defendants changed positions in the vehicle throughout the night.  Moreover, Mr. Ware, who was chased by the assailant, was shown the red coat in court and affirmed that the assailant was wearing "a coat like that."  Both victims gave descriptions of the weapon used by the assailant, and a weapon of similar description was found when co-defendant Wynn dropped a gun as he was fleeing from the PT Cruiser.  Moreover, Mr. Ware testified that he was familiar with the Defendant

- 20 -

because the Defendant used to live several apartments down from him and that the masked man was the same build, height, and weight as the Defendant. Mr. Ware then identified the Defendant in court as the person with whom he was familiar, irrespective of any change in appearance.

The evidence viewed in the light most favorable to the State was sufficient to establish the Defendant's identity as the perpetrator of the first episode. The Defendant is not entitled to relief.

*III. Impeachment of Co-defendant McMillan*

The Defendant submits that the trial court erred by permitting the State to impeach co-defendant McMillan with her prior inconsistent statement to Investigator Day that the Defendant was wearing a red coat when he went inside Austin Homes. According to the Defendant, the jury was unlikely to consider the statement only for impeachment purposes and likely viewed it as substantive evidence establishing the Defendant's identity as the perpetrator of the aggravated assaults and attempted aggravated robberies of Mr. Ware and Mr. Jefferson. The Defendant further contends that the trial court's curative instruction to the jury was insufficient to render the error harmless and inadequate to avoid the prejudicial effect of the prior statement. The State responds that admission of the prior statement was proper as impeachment evidence and that the trial court's instruction significantly limited whatever danger of unfair prejudice accompanied the admission.

During Investigator's Day testimony, the parties, outside the jury's presence, discussed the admission of co-defendant McMillan's statements that she made in her interview with Investigator Day, statements that were both consistent and inconsistent with her trial testimony. After the trial court found that certain consistent statements were only admissible as corroborative proof and not as substantive evidence, the following colloquy took place:

> [THE PROSECUTOR]: Then also the area about the red jacket. This would be an inconsistent statement because she never identified that red jacket and never said that he was wearing it, but in the statement to Investigator Day she mentioned the red jacket and described it—
>
> THE COURT: How could you put that in though? That's not con— that's not a consistency to what she testified. How would it corroborate anything?
>
> [THE PROSECUTOR]: We submit, your Honor, it would come in at this—that would be the opposite of it. It would be an inconsistent statement

from what she said yesterday. She was asked about that. She was allowed— tried, you know, to explain it. She denied making the statement—

THE COURT: If you—the voucher rule doesn't exist, so if you want to question him about the fact she said it previously, you may. But I've obviously got to give the jury a limiting instruction that that is not substantive proof. That what she testified no yesterday is the proof.

That ended the discussion regarding the statement's admission.

In <u>King v. State</u>, our supreme court adopted the rule that a party can impeach his or her own witness under the following circumstances:

[A] party is compelled to call an indispensable witness, or a witness that is hostile taking the party by surprise . . . but the impeachment of one's own witness is limited to those cases where his testimony is in direct contradiction to his prior statements, and he cannot be impeached where he is merely reluctant to give testimony or unless the testimony is actually prejudicial.

215 S.W.2d 813, 815 (Tenn. 1948) (quoting 1 <u>Wharton's Criminal Evidence</u> § 484a (10th ed.)). The ruling in <u>King</u>, however, which embodied the voucher rule, is no longer controlling and has been replaced by Tennessee Rule of Evidence 607. <u>State v. Jones</u>, 15 S.W.3d 880, 892 (Tenn. Crim. App. 1999).

Tennessee Rule of Evidence 607 allows a party to impeach its own witness. In addition, Tennessee Rule of Evidence 613 permits impeachment of a witness with a prior inconsistent statement. Under Tennessee Rule of Evidence 803(26), a prior inconsistent statement also may be used as substantive evidence if that statement is otherwise admissible under Rule 613(b) and:

(A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.
(B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.
(C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Though co-defendant McMillan's inconsistent statement regarding the red coat met the general parameters of both Rule 613(b) and Rule 803(26), there was no discussion regarding the requirements of Rule 803(26) or the requisite finding of trustworthiness required by that Rule. Consequently, co-defendant McMillan's statement about the red

coat was not admitted as substantive evidence, and she was questioned about the prior statement for purposes of impeachment only. If a prior inconsistent statement is introduced only for impeachment purposes, "it is well established that a witness may not be impeached primarily for the purpose of introducing the prior inconsistent statement." Neil P. Cohen et al., Tennessee Law of Evidence § 6.13[2][d] (6th ed. 2011); see State v. Rayfield, 507 S.W.3d 682, 698 (Tenn. Crim. App. 2015). This court has recognized that "[i]mpeachment cannot be a 'mere ruse' to present to the jury prejudicial or improper testimony.'" State v. Jones, 15 S.W.3d 880, 892 (Tenn. Crim. App. 1999) (citing State v. Roy L. Payne, No. 03C01-9202-CR-00045, 1993 WL 20116, at *2 (Tenn. Crim. App. Feb. 2, 1993)). In such situations, a jury may "misuse the statement by considering it as substantive evidence." Neil P. Cohen et al., Tennessee Law of Evidence § 6.13[2][d] (6th ed. 2011).

There is no evidence in the record that the State was aware at trial that co-defendant McMillan would repudiate her prior statement to Investigator Day relative to the Defendant's wearing a red, puffy coat when he went inside Austin Homes on January 13, 2017. In fact, the State attempted to refresh co-defendant McMillan's recollection at trial with her prior "testimony" about what the Defendant was wearing when he went inside Austin Homes, but after reviewing it, co-defendant McMillan said that she thought that the jacket "was like a dark blue though." She did not recall ever telling Investigator Day otherwise. Here, co-defendant McMillan's prior inconsistent statement spoke directly to the credibility of her recollection of Defendant's clothing on the night of the crimes, and her credibility on this issue was of significant value. "Nothing in the record suggests that the impeachment 'was calculated to and did serve only one purpose which was to put before the jury the out of court statements.'" State v. Deangelo Taylor, No. W2016-00718-CCA-R3-CD, 2017 WL 2629478, at *6 (Tenn. Crim. App. June 16, 2017) (quoting State v. Mays, 495 S.W.2d 833, 837 (Tenn. Crim. App. 1972)) (reaching same conclusion under similar facts). Moreover, the trial court's instruction specifically instructed the jury that the red coat statement was only admissible as impeachment evidence, and it sought to limit any prejudicial impact. The trial court also gave multiple similar instructions regarding the use of co-defendant McMillan's statement. "The jury is presumed to follow its instructions." State v. Young, 196 S.W.3d 85, 111 (Tenn. 2006). For all of these reasons, the Defendant's argument must fail.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE